JANVIER, Judge.
Plaintiff, a laborer on the river front in New Orleans, sustained physical injuries on December IS, 1950, when he was struck on his left knee by a lift machine of which the brakes seem to have been defective and which was being operated near the spot at which he was working. He was paid compensation for total disability at the rate of $30 per week for 20 weeks and then discharged by the doctors as able to return to work. He claims that he is unable to work and has brought this suit against his former employer and its compensation insurance carrier, alleging that he is totally permanently disabled. He prays for solidary judgment against the two defendants in the sum of $30 per week for 380 weeks, giving credit for payment of 20 weeks which he has already received.
Plaintiff’s contention is that he suffers from two conditions which completely disable him. The first of these alleged conditions is thrombo-phlebitis and the second is post-traumatic conversion hysteria. Thrombo-phlebitis, according to the experts, seems to be, as stated by Dr. Schlesinger, “the inflammation of the interior- of the lining of the vein with a formation of a clot in the wall of a vein.” Post-traumatic conversion hysteria we understand to be a nervous condition induced by or following a trauma and as a result of which the suf *675 ferer, though possibly not actually physically ill at all or only slightly physically disabled, is convinced of his disability to do anything resembling the work which was formerly done by him.
Defendants, admitting that plaintiff sustained accidental injuries, deny that he is disabled and maintain that he could, if he would, return to his former occupation.
After a lengthy trial in which numerous medical experts testified, there was judgment dismissing plaintiff’s suit, the court
“being of the opinion that plaintiff had fully -recovered from all physical effects of the .accident of December 15, 1950, prior to his discharge from compensation by the Insurance Company - doctors in May, 1951, and being of the further opinion that the evidence preponderates to the effect that plaintiff . has not now and never did have phlebitis as a result of -said accident and be- , ing of the further opinion that plaintiff has not sustained the burden of proving that plaintiff’s mental condition was caused or aggravated by the accident of December 15, 1950, *
We think that there is no doubt at all that the expert testimony given on behalf of defendants overwhelmingly preponderates. Even. those' experts who .testified on behalf of plaintiff were of the opinion that it could not be definitely determined whether plaintiff could resume his former work unless he should try to do so and should make a serious effort to ascertain whether he could' continue to work. Even Dr. Salatich, who testified most favorably for plaintiff, when asked whether plaintiff could return to work) said:
“ * *. * He may be able to do it one or two days or a week, but I think that hour after hour, day after day, week after week, he wouldn’t be able to carry on his physical activity of any strenuous nature. * * * ”
We think that it would serve no useful purpose-to discuss in detail the medical testimony and shall therefore limit our discussion of this testimony to references to a few of the statements given by those experts to show that almost without exception they believed plaintiff able to return, to work or at least felt that they could not declare him unable to do so unless he should first make a serious attempt.
Dr. Maurer, who was produced as a witness by plaintiff, was asked:
“Doctor, you think this man could return to his former occupation and labor, climbing ladders and standing any length of time?”
He answered:
“No. I think he should be tried out. That’s the best way to do it. Try it out and have doctors observe him — not just let him go and see if he is all right. I think he should try it and be examined after trying. Let him try it every day for a week. I have never seen swelling in the case. * * * ”
Dr. Schlesinger, who was produced as a witness by defendants, said that he had examined the plaintiff on January 20, 1951, which was about five weeks after the accident. As a result of the examination, he said:
“ * * * I felt the patient had made a good recovery from the accident of 15 December, 1950, and should get out of bed and attempt to ■ rehabilitate himself. It ,was felt that since the patient had remained in bed for several weeks, that the tone of muscles had weakened by bedrest, and it was advised that the patient should have some therapy along with' exercise to build up his morale and physical condition and allow him to return to work without difficulty. I felt that that should take approximately two or three weeks. * * * ”
Dr. Irvin Cahen, also placed on the witness stand by defendants, said that he had examined the plaintiff about one month after the accident. He was asked:
“With relation to the accident, you found nothing wrong with Mr. Jackson’s leg, as far as the accident was concerned?”
and he answered:
“As far as the accident was cq-n- ' cerned,.! saw no residual at that time.”
*676 Dr. Geismar, who was called to treat plaintiff on the day of the accident and who was produced as a witness by the defendants, says that he had a bruise of the left knee and that he treated him until January 2nd. He says that, on January 2nd, the plaintiff called him, complaining of chills and fever, but that he refused to treat him,
“because I could see no relation between the chills and fever and the conditions that I had seen just the day previously; the contusion of the knee was without objective physical findings.”
Dr. Winokur, who testified on behalf of defendants, says that he saw the plaintiff on February 9, 1951, which was almost two months after the occurrence of the accident, and that he gave him therapy treatments practically every day from February 9th to March 6th, and that at no time during that period did he find any swelling in the knee, but that he continued to treat him because he continued to complain of pain. He says that then he discontinued treatments adding:
“ * * * I felt he shouldn’t have any more treatment because I couldn’t find anything to treat.”
Dr. LeNoir, also produced as a witness, saw the plaintiff on April 2, 1951, which was three and one-half months after the accident. He said:
“My opinion was that the patient’s physical status was such he was physically able to resume his occupation as -a cooper to an unlimited degree,, and that no partial permanent disability existed as a result of .the traumatic episode to the left knee.”
We .repeat that the medical testimony is overwhelming to the effect that so far as the plaintiff’s physical condition is concerned he could return to work whenever willing to do so.
The other condition complained of is post-traumatic conversion hysteria, and there is- no doubt that the plaintiff does suffer from some form of nervous hysteria, but the record convinces us that this particular accident had nothing to do with his present nervous condition and that he evidenced the same symptoms which now appear long before the occurrence of this accident.
Dr. Sam. Nelken, who did not testify but whose written opinion was admitted in the record by agreement, stated in that report, which is dated July 6, 1951,
“ * * * this man is completely disabled by a post-traumatic conversion hysteria, perhaps complicated by some residual structural damage, and will continue to be so for a long indefinite period.”
The record leaves no doubt at all, as we have said, that this condition was present long before the occurrence of the accident. As a matter of fact the plaintiff,' in September, 1948,' had effected a compromise settlement of another compensation claim and had received $3,250, and in the record which evidences the approval by the Civil District Court of that compensation settlement there appears a statement by Dr. Barkoff, who also testified in the case at bar, and in this statement given by Dr. Barkoff in the earlier, case, which statement is dated September 1, 1948, he said: -
“The neurological findings are typically those of conversion hysteria,
“My impression is that this is an individual who has a conversion hysteria with some mildly depressive features. This is not a result of his injury, but rather of a long standing difficulty adjusting to life and his ability to work has not been impaired by his accident in 1947.”
In his testimony in the case at bar, Dr. Barkoff, referring to the present mental or nervous condition of the plaintiff, said:
“ * * * I feel this is a man who is inadequate in meeting life the result of which he is down, breaking down. Any little thing that comes along would be like the straw that broke the camel’s back.”
Our opinion is that, as a matter of fact while the • plaintiff does suffer from some form of nervous hysteria, it is probably “compensation -hysteria,” from- which he principally suffers, and he does so-for'the reason, as given by Dr. Barkoff,
*677 “ * • + * that this man’s conversion hysteria became worse when there was some thought of the possibility of getting some compensation.”
Our conclusion is that the plaintiff, at the time of the trial, suffered no physical disability which was caused by the accident, and that the accident had no' causal connection whatever with the hysteria from which he now suffers, and we say this in spite of the fact that Dr. Barkoff, at the end of his testimony after a lengthy cross-examination, stated that the hysteria from which the plaintiff now suffers might possibly have been increased by the accident in a very mild degree; “not more than two to five per cent at most.”
The judgment appealed from is affirmed at the cost of appellant
Affirmed.